IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CA NO.: 3:20 -cv- 290

| | |
|---|---|
| WAGAYE GOBENA, on behalf of herself and all others similarly situated, )<br><br>  *Plaintiff,* )<br><br>   v. )<br><br>COURIERNET, INC., )<br><br>  *Defendant.* ) | **COLLECTIVE AND CLASS ACTION COMPLAINT** |

Plaintiff Wagaye Gobena, by and through counsel, on behalf of herself and all others similarly situated (collectively "Plaintiffs"), hereby sets forth this collective and class action against Defendant CourierNet, Inc. (hereinafter "Defendant"), and alleges as follows:

## PRELIMINARY STATEMENT

1. This action is brought individually and as a collective action for unpaid minimum wage compensation, overtime compensation, liquidated damages, and all related penalties and damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Defendant had a systemic company-wide policy, pattern, or practice of misclassifying their employees as exempt from the FLSA, willfully failing to compensate employees for all hours worked, willfully failing to compensate employees at the

appropriate overtime rate for overtime hours worked, and violating statutory recordkeeping provisions. Defendant also had a systemic, company-wide policy misclassifying its couriers as independent contractors in violation of the Fair Labor Standards Act.

2. This action is also brought individually and as a class action against Defendant for failing to compensate Plaintiff and Putative Plaintiffs all owed, earned, and/or promised wages, on their regular pay date, in direct contravention of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq*.

3. Plaintiff brings this class and collective action on behalf of herself and all other Couriers who have worked or currently work for Defendant in the United States. Additionally, Defendant has misclassified its courier drivers, including Plaintiff, as independent contractors rather than employees, and failed to pay them overtime, minimum wage, earned wages, and other wages owed under state and federal law.

4. Plaintiff also brings this action individually for misclassifying her as an exempt employee during her time as dispatcher and failing to pay her overtime and other wages owed under state and federal law. She also brings this action individually for age-based harassment, discrimination, and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 to 29 U.S.C. § 634. As alleged with greater specificity below, Defendant subjected Plaintiff to age-based discrimination and harassment, which created a hostile work environment, leading to Plaintiff filing a formal

2

complaint with the CEO of Defendant. When Plaintiff reported this situation, Defendant took an unlawful adverse employment action against Plaintiff. Accordingly, Plaintiff seeks all available relief for these claims, including, but not limited to, back pay, front pay, past pecuniary losses, prejudgment interest, compensatory damages, punitive damages, attorney's fees and costs, and all other relief permitted by applicable law.

## PARTIES

5.     Plaintiff Wagaye Gobena is an adult resident of Raleigh, North Carolina. She worked as a dispatcher and courier for Defendant in its Morrisville and Cary, North Carolina offices from July 2016 until January 2020.

6.     Plaintiff brings this action as a collective action for violation of the FLSA pursuant to Section 16(b) of the FLSA 29 U.S.C. § 216(b), on behalf of the following class:

> All individuals who signed an agreement to provide courier services to Defendant, and performed courier services, pursuant to that agreement, as independent contractors for Defendant, and who have not been paid minimum wage and overtime compensation, during the three (3) years preceding the filing of this action.

7.     The collective action is comprised of similarly situated individuals who are entitled to notice of this action under 29 U.S.C. § 216(b).

8.     The members of the proposed Rule 23 class include the following:

> All individuals who signed an agreement to provide courier services to Defendant, and performed courier services, pursuant to that agreement, as

3

independent contractors in North Carolina for Defendant, who were not Copaid their earned, accrued, and promised wages, including, but not limited to, any unpaid straight and/or overtime wages, and were subjected to unlawful deductions during the two (2) years preceding the filing of this action.

9.      Defendant is a corporation organized under the laws of Georgia, with its principal place of business located at 1135 Atlanta Industrial Drive, Marietta, Georgia 30066.

10.     According to its website, Defendant is a courier company "specializing in on-demand deliveries, pharmaceutical/medical specimen transportation, and customizing distribution networks for customers across many industries. [Defendant] also specializes in facilities management, warehousing, next-day deliveries, and distribution through a dynamic fleet of cars, cargo vans, box-trucks and tractor-trailers. [Defendant] provides these services across the Southeast United States, including Georgia, North and South Carolina, Mississippi and Alabama."

11.     According to its website, Defendant employs "more than 500 professional drivers and 75 dispatchers, managers and executive leaders."

12.     Upon information and belief, during the time period relevant to this action, Defendant operated as an employer, joint employer, or member of an integrated, common enterprise, that employed Plaintiff and all others similarly situated, pursuant to the FLSA and NCWHA, in that Defendant, or its agents, held or implemented the power, *inter alia*,

4

to control the work performance of Plaintiff and all others similarly situated, and Defendant received the benefit of the labor of Plaintiff and all others similarly situated.

## JURISDICTION AND VENUE

13.     This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 for the claims brought under the FLSA, 29 U.S.C. § 201, *et seq*. and under ADEA, 29 U.S.C. § 621 *et seq*.

14.     The United States District Court for the Western District of North Carolina has personal jurisdiction because Defendant conducts business in Mecklenburg County, North Carolina, which is located within this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendant conducted business within the Western District of North Carolina, and the substantial part of the events or omissions giving rise to these claims occurred in this District.

16.     The claims for violations of the NCWHA are based upon the statutory law of the State of North Carolina.

17.     Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the NCWHA; negligent hiring, supervision, and retention; and wrongful termination, because those state law claims arise out of the same nucleus of operative fact as the FLSA and ADEA claims.

5

18.     All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness and convenience for the parties.

19.     Upon information and belief, during the time period relevant to this action, Defendant was an employer that employed Named and Putative Plaintiffs, pursuant to the FLSA, NCWHA, and ADEA, in that Defendant, or its agents, held or implemented the power, *inter alia*, to control the work performance of Named and Putative Plaintiffs, and Defendant received the benefit of Named and Putative Plaintiffs' labor.

## COVERAGE ALLEGATIONS

20.     At all times material to this action, Defendant was an employer within the defined scope of the FLSA, 29 U.S.C. § 203(d).

21.     At all times material to this action, Plaintiff and all others similarly situated were individual employees of Defendant within the scope of the FLSA, 29 U.S.C. §§ 206 and 207.

22.     At all times material to this action, Defendant was an enterprise engaged in commerce or the production of goods for commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), in that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000.

6

23.     At all times material to this action, Plaintiff was an employee of Defendant within the meaning of the ADEA, 29 U.S.C. § 630(f).

24.     At all times material to this action, Defendant has continuously been an employer, with twenty (20) or more employees, engaged in an industry affecting commerce within the meaning of the ADEA, 29 U.S.C. § 630(b).

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

25.     Plaintiff began work for Defendant in July 2016 and was terminated on January 29, 2020.  During her period of employment with Defendant, Plaintiff worked as both a Dispatcher and Courier.

26.     Plaintiff was paid an annual salary for her work as a dispatcher. Plaintiff's ending salary was $38,000 per year.

27.     In her role as a Dispatcher, Plaintiff was responsible for answering calls from clients and couriers; submitting and editing tickets put into computer systems; and dispatching tickets, tasks, and jobs to couriers.

28.     Defendant controlled all aspects of Plaintiff's work, including but not limited to, the manner in which she performed the work, the time she was required to be at work, and the type of work she performed.  Defendant told Plaintiff what to do, when to do it, and how she was supposed to do it.

29.     Plaintiff did not exercise independent judgment or discretion while fulfilling her job responsibilities and did not have the authority to hire or fire.

30.     Plaintiff was employed as a Dispatcher.  Her position did not require a high degree of skill.  Company supervisors instructed Plaintiff and other workers on how to do their jobs.

31.     Plaintiff worked under the direct supervision of Defendant's managers who managed and directed her work.

32.     Plaintiff was paid the same rate of pay regardless of the number of hours she worked in a workweek, even for those hours over 40 in a week.  Thus, Plaintiff was not compensated at the appropriate overtime rate for any hours over 40 worked in a workweek.

33.     Defendant had a policy and practice of not recording Plaintiff's actual hours worked. Plaintiff was not required to clock-in, clock-out, or otherwise record her time.

34.     While Plaintiff was promised compensation time ("comp time") or extra time off from work instead of overtime pay, for any hours that she worked over 40 in a workweek, such comp time was never tracked, recorded, or available for Plaintiff to use. Defendant never paid Plaintiff for her comp time, either before or after her termination.

35.     In fact, when Plaintiff's previous manager, Joe Looby, was replaced by Stephanie Bell in approximately November 2018, Stephanie informed Plaintiff that she would in no way honor or pay Plaintiff for any comp time Plaintiff had accumulated up until that point. Stephanie advised Plaintiff she was doing this because Mr. Looby did not keep track or record Plaintiff's comp time.

8

36. From May 2017 to November 2017, Plaintiff typically worked scheduled shifts as a dispatcher of 9 hours per day, 5 days per week, with no lunch breaks. Plaintiff also typically worked an additional .75 hours of unscheduled time per week during this period. Thus, Plaintiff typically worked at least 45.75 hours per week during this period. For just one week during this time-period, Plaintiff is due $157.57 in unpaid overtime wages.

37. From December 2017 to June 2018, Plaintiff typically worked scheduled shifts as a dispatcher of 9 hours per day, 5 days per week, with no lunch breaks. Plaintiff also typically worked an additional 2.5 hours of unscheduled time per week during this period. Thus, Plaintiff typically worked at least 47.5 hours per week during this period. For just one week during this time-period, Plaintiff is due $205.53 in unpaid overtime wages.

38. From July 2018 to December 2018, Plaintiff typically worked scheduled shifts as a dispatcher of 9 hours per day, 5 days per week, with no lunch breaks. Thus, Plaintiff typically worked at least 45 hours per week during this period. For just one week during this time-period, Plaintiff is due $137.02 in unpaid overtime wages.

39. From January 2019 until June 2019 Plaintiff typically worked scheduled shifts as a dispatcher of 9 hours per day, 5 days per week, with a 30-minute unpaid lunch break per day. Thus, Plaintiff typically worked at least 42.5 hours per week during this period. For just one week during this time period, Plaintiff is due $68.51 in unpaid

9

overtime wages.

40.    From July 2019 to September 2019, Plaintiff typically worked 5 days per week as a dispatcher with a scheduled shift of 9 hours each day, including a 30-minute paid lunch break, or approximately 42.5 hours per week. During this time, Plaintiff also worked one day per week as a Courier, typically working between 6.5 and 7.5 hours per day. Cumulatively, Plaintiff typically worked between 49 and 50 hours per week from June 2019 to September 2019.  For just one week during this time-period, Plaintiff is due $274.04 in unpaid overtime wages.

41.    From October 2019 until her termination date (January 29, 2020), Plaintiff typically worked scheduled shifts as a dispatcher of 9 hours per day, 5 days per week, with a 30-minute unpaid lunch break per day. Thus, Plaintiff typically worked at least 42.5 hours per week during this period. For just one week during this time period, Plaintiff is due $68.51 in unpaid overtime wages.

42.    Plaintiff was discouraged by her manager, Joe Looby, from taking any lunch breaks from May 2017 to December 2018. When Plaintiff did request to eat, Joe encouraged her to eat at her workstation and continue working. This policy did not change until a new manager, Stephanie Bell, took over and allowed Plaintiff to take a full 30-minute uninterrupted lunch break starting sometime in December 2018.

43.    Plaintiff was routinely required to be on-call during her days off. Plaintiff typically performed one to two hours of work while on-call per month throughout the

entirety of her employment with Defendant.

## FLSA COLLECTIVE ACTION ALLEGATIONS

44.     From July 2019 to September 2019, Plaintiff worked in both roles as a dispatcher and courier for Defendant. Plaintiff worked exclusively as a dispatcher at all other times during her employment with Defendant.

45.     As stated above, during the time Plaintiff worked as both a Dispatcher and Courier, Plaintiff consistently worked approximately 49 to 50 hours per week, not including any miscellaneous additional hours worked.

46.     Similarly situated full-time couriers typically worked 5 days per week performing courier services for Defendants, approximately 45 hours per week.

47.     Plaintiff and similarly situated couriers perform pick-up and delivery services of supplies, materials, and medical specimens for Defendant, which contracts with other companies desirous of these services.  Defendant then assign specific pick-ups and deliveries to couriers such as Plaintiff on a daily basis.

48.     All couriers sign a standard independent contractor agreement that purports to classify them as independent contractors, as opposed to employees; however, in reality, they are employees of Defendant.

49.     Defendant exercises extensive control over the manner in which couriers perform their jobs and conduct themselves while working for Defendant.

50.     Plaintiff and similarly situated couriers worked assigned shifts or "runs"

11

during which they begin their shift at a time assigned by Defendant.

51.     Near the beginning of each shift, Defendant electronically transmit the assigned route to each courier, which lists each stop that they must make during the shift and the time that they must arrive.

52.     The couriers are required to run the route and perform the pick-ups in the exact order that has been established by Defendant, even if it is inefficient.  Plaintiff and similarly situated couriers were reprimanded when they attempted to perform the pick-ups in a different order than assigned by Defendant.

53.     Defendant tracks the courier's progress throughout their shift via GPS, and couriers are required to have their GPS on at all times so that Defendant can track them.

54.     Defendant tracks and retains this GPS data, location data, and other forms of data from the "e-courier" and "data-trac" programs used by Defendant and couriers.

55.     Defendant requires Plaintiff and other couriers to wear a shirt with a "CourierNet" logo.

56.     Defendant requires Plaintiff and other couriers to have a "CourierNet" ID badge with their picture visible at all times while working.

57.     Defendants provides Plaintiff and other couriers tools and equipment to successfully complete their job responsibilities, such as a cooler, also called "specimen bag," for storing any specimens that are transported; ice packs; lock box keys; pickup and drop-off manifests to record times specimens are picked up and dropped off; and "spill

kits," which was used to clean up specimens which spilled by accident.

58.     In addition, Defendant is in the business of providing courier services, and Plaintiff and other couriers perform these exact services in the usual course of this business; without the couriers, Defendant would have no business.

59.     Plaintiff, while working as a courier, and other couriers are not paid any hourly wage.  Instead, Defendant pays them a set amount per "run" or shift.  For example, the rate for a run on Sunday is $36. The rate is unilaterally determined by Defendant and couriers could not negotiate directly with Defendant's customers regarding the price of their delivery services.

60.     Defendant does not pay an additional premium or overtime rate when couriers work more than forty hours in a given week.

61.     Defendant deducts various amounts from the couriers' pay on a weekly basis; for example, Defendant deducts "insurance" charges for a worker's compensation insurance policy, which was charged at a variable rate depending on how much the courier made that week, and they deduct an additional amount for use of their software application through which couriers receive their work assignments.

62.     Plaintiff and other couriers pay a substantial amount of Defendant's business expenses, such as the costs of fuel and vehicle maintenance.

63.     Because Defendant classified Plaintiff as an employee during her work as a Dispatcher, and misclassified her as an independent contractor during her work as a

13

Courier, Defendant told Plaintiff that she needed to use her Daughter's social security number, or that she needed to set up a an Limited Liability Company ("LLC"), as she could not be both an employee and independent contractor in Defendant's payroll systems.

64.    Thus, Plaintiff set up an LLC, GoBe Concierge LLC, in order to work as a courier for Defendant.

65.    Plaintiff brings the First and Second Causes of Action of the instant Complaint both individually and as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of herself and all similarly situated couriers.

66.    Members of the FLSA class are similarly situated.

67.    Members of the FLSA class have substantially similar job requirements and pay provisions, and are subject to common practices, policies, or plans that misclassified them as independent contractors.

68.    There are numerous (in excess of 500, upon information and belief) similarly situated current and former couriers nationwide that fall within the scope of the aforementioned FLSA class.

69.    These similarly situated couriers are known to Defendant, are readily identifiable, and can be located through Defendant's records.

70.    Members of the proposed FLSA class, therefore, should be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

14

71.     Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Plaintiffs.

72.     Plaintiff consents in writing to assert her claims for unpaid wages under the FLSA pursuant to 29 U.S.C. § 216(b).  Plaintiff's signed consent form is filed with the Court as Exhibit A to this Complaint.  As this case proceeds, it is likely other individuals will file consent forms and join as opt-in plaintiffs.

73.     Plaintiff requests that she be permitted to serve as the representative of those who consent to participate in this action, and that this action be conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

## RULE 23 NCWHA CLASS ACTION ALLEGATIONS

74.     Defendant maintains a corporate policy of failing to pay all earned, promised and accrued wages on Plaintiff and putative class members' regular pay date and making unlawful deductions from employees' paychecks to cover the costs of insurance fees, app fees, etc., without receiving proper advance written authorization as required by the NCWHA, N.C. Gen. Stat. §§ 95-25.1, *et. seq*.

75.     Defendant failed to pay couriers all legally due wages on their regular payday; this requirement is not covered by the minimum wage or overtime provisions of the FLSA.  Thus, Defendant has failed to pay promised regular and overtime wages.

76.     Plaintiff brings the Third Cause of Action of the instant Complaint both individually and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules

15

of Civil Procedure, on behalf of herself and all similarly situated couriers, for relief to redress and remedy Defendants' violations of the NCWHA, N.C. Gen. Stat. § 95-25.1, *et seq*.

77. <u>Numerosity</u>: The proposed class is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of class members is unknown to Plaintiff at this time, upon information and belief, the class comprises at least 500 individuals.

78. <u>Common Questions Predominate</u>: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendant's failure to lawfully compensate them. The common questions of law and fact include, but are not limited to, the following:

a. Whether Defendant provided any advance written notice of its intent to make wage deductions for the cost of insurance, app charges, and other fees in the manner required by the NCWHA;

b. If Defendant did provide employees with any form of written notice of its intent to make wage deductions, whether the content of that notice complied with the technical requirements of the NCWHA;

c. Whether Defendant failed to compensate putative NC Class Members at the

16

earned, accrued, and/or promised rate for all hours worked, up to forty (40) hours per week;

d. Whether Defendant failed to compensate putative NC Class Members at the earned, accrued, and/or promised rate, including, but not limited to, any overtime for all hours worked, in excess of forty (40) each week; and

e. Whether Defendant failed to compensate putative NC Class Members for all of their earned, accrued, and/or promised wages, including, but not limited, straight-time and overtime on their regular pay date, in violation of the NCWHA.

79. <u>Typicality</u>: The claims of Plaintiff are typical of the claims which could be alleged by any member of the putative North Carolina class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendant, as alleged herein, of failing to pay couriers for all hours worked, either at the appropriate straight or promised rates for hours less than forty (40) per week or the appropriate overtime rate for hours worked in excess of forty (40) per week, and/or for Defendant's deduction policy, of failing to provide proper notice of intended deductions from courier's pay pursuant to N.C. Gen. Stat. § 95-25.8. Defendant's deduction policies and practices affected all putative NC class members similarly, and Defendant benefited from the same type of unfair and/or unlawful acts as to each putative NC class member.

17

Plaintiff and members of the proposed NC class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

80.    Adequacy of Representation: Plaintiff is able to fairly and adequately protect the interests of all members of the proposed NC class, and there are no known conflicts of interest between Plaintiff and members of the proposed class.  Plaintiff has retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

81.    Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all class members is impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender.  Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them.  On the other hand, important public interests will be served by addressing the matter as a class action.  The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class action.  Prosecution of separate actions by individual members of the

18

proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendant, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties. The issue in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

82. <u>Public Policy Considerations</u>: Defendant violated the NCWHA. Just as current couriers and other employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former couriers and other employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

83. Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiff and members of the proposed class.

## AGE-BASED HARASSMENT AND RETALIATION FACTUAL ALLEGATIONS

84. Plaintiff is fifty-one (51) years old, and was the oldest person working in her office for Defendant for the majority of her time working for Defendant.

85. In approximately November 2018, Defendant transferred Stephanie Bell,

19

who was a Human Resources manager for Defendant in Atlanta, Georgia, to Plaintiff's office as a Human Resources/Operations Manager. Stephanie was in her early forties and had a position of authority over Plaintiff.

86.     Shortly after Stephanie was transferred to Plaintiff's office, she began to make disparaging comments about older employees regarding their age.

87.     During one incident, Stephanie remarked to Plaintiff that Stephanie thought that an older salesperson should just retire because of his age. After making this remark to Plaintiff, Stephanie then included the salesperson in less communications to try and get him to retire.

88.     In another incident, Stephanie directed Plaintiff not to give work to an older courier that involved traveling out of town because the courier's age made them slow and not as productive as the younger couriers.

89.     Stephanie would frequently say belittling comments to Plaintiff regarding Plaintiff's age. For example, Stephanie once asked Plaintiff for her ideas on what to get someone as a gift. When Plaintiff recommended a fruit basket, Stephanie belittled Plaintiff and told her "I don't want to hear about a grandma gift."

90.     Such treatment made Plaintiff feel deeply uncomfortable, unsafe, and like she had a target on her back.

91.     Stephanie would frequently miscommunicate things to Plaintiff to make Plaintiff's work performance suffer. Such treatment was designed to humiliate Plaintiff in

20

front of other employees. Because of Stephanie's belittling remarks regarding Plaintiff's age, Plaintiff felt like Stephanie wanted to humiliate and embarrass her because of Plaintiff's age.

92.     Stephanie also attempted to turn couriers and other employees against Plaintiff and use Plaintiff as a scapegoat when couriers were shorted on pay. Stephanie did this by communicating false information to couriers to make them believe that they were not being paid for certain time because Plaintiff, working in her capacity as a dispatcher, was not telling the courier's customers that they would have to pay for certain extra charges.

93.     While still employed with Defendant, one of Plaintiff's younger co-workers acknowledged that Stephanie treated Plaintiff much worse than other employees, and believed such negative treatment was attributed to Plaintiff's age.

94.     On October 30, 2019, Plaintiff submitted an internal complaint about Stephanie's discriminatory behavior to Defendant, including Defendant's CEO, Jay Arena.

95.     In his initial response to Plaintiff's complaint, Mr. Arena noted that "[w]e take such complaints seriously and will certainly review your complaint in more depth, in order to better respond to you. I do want to agree with you that age-related comments about any employee or contractor are inappropriate, but I do believe that any comments made . . . are in relation to job performance, rather than age."

21

96.     Thus, prior to investigating Plaintiff's complaint, Mr. Arena was already of the opinion that Plaintiff did not suffer age-based discrimination or harassment, despite agreement that "age-related comments about any employee or contractor are inappropriate."

97.     Prior to the conclusion of Defendant's investigation into Plaintiff's complaint, Mr. Arena offered Plaintiff a "severance proposal" in exchange for Plaintiff's resignation and waiver of claims against Defendant. Plaintiff understood this to be an attempt to push her out of Defendant's organization, and subsequently declined said proposal.

98.     On January 6, 2020, Defendant concluded its investigation into Plaintiff's complaint. Mr. Arena, without sharing any investigative report or findings, informed Plaintiff that her concerns of age-based harassment and discrimination were unsubstantiated. However, Mr. Arena did admit in his correspondence that "[o]thers did, however, tell us that the office environment is very tense."

99.     Mr. Arena then told Plaintiff "Stephanie is the manager of the Raleigh office and as the manager she is responsible for operations. I have confidence in Stephanie's ability to manage the office and questions or concerns about operations should be addressed with her. However, if you have any questions or concerns that you do not feel you can or should discuss with Stephanie, you may contact me."

100.    Thus, Mr. Arena was informing Plaintiff that her only recourse to report her

complaints of age-based harassment and discrimination was to report them to Stephanie, whom was the subject of Plaintiff's complaint, or to Mr. Arena himself, whom prior to investigating Plaintiff's complaint, admitted that he did not believe Plaintiff was discriminated against or harassed.

101. Defendant ignored Plaintiff's complaints and took no action to correct the situation.

102. After Defendant's dismissal of Plaintiff's complaint, Stephanie's abuse, harassment, and discrimination towards Plaintiff on account of her age became even more frequent and intense.

103. On January 29, 2020, under a false pretext that Plaintiff did not follow Defendant's standard operating procedure in reporting an issue with a courier, Stephanie prepared a formal write-up against Plaintiff and told Plaintiff that she was required to sign the write-up.

104. Defendant has no written standard operating procedure. Despite this, Plaintiff followed every informal procedure communicated to her by management in trying to handle the situation. When Plaintiff asked Stephanie for guidelines on how to handle this situation differently, Stephanie did not provide her with any guidelines.

105. When Plaintiff refused to sign the write-up due to the false statements contained within it and because Stephanie refused to provide her guidance on what to do differently in the future, Stephanie then terminated Plaintiff's employment.

23

106.    Plaintiff's termination was less than one month after Plaintiff's age-based discrimination and harassment complaint was dismissed by Defendant. Plaintiff believes such termination is in retaliation for her submitting her complaint against Stephanie.

107.    Plaintiff suffered fear and emotional distress resulting from the ongoing harassment and discrimination based on her age, with symptoms including but not limited to headaches, insomnia, nightmares, anxiety, and depression.  To make matters worse, while she had been employed with CourierNet for approximately four (4) years, she was wrongfully terminated as an act of retaliation for complaining against her supervisor's discriminatory conduct, and due to her age and COVID-19 circumstances, she has experienced financial distress given her inability to find comparable employment.

108.    Plaintiff filed a charge of discrimination against Defendant on or about February 20, 2020, with the Equal Employment Opportunity Commission.

109.    Plaintiff received notice of her right to sue for age-based harassment and retaliation on February 24, 2020.  Plaintiff has attached said notice to this complaint as Exhibit B.

**FIRST CAUSE OF ACTION**
**Violation of the Fair Labor Standards Act – Failure to Pay Minimum Wage**
**29 U.S.C. § 201, *et seq*.**
**Brought by Plaintiff on Behalf of Herself and all Similarly Situated Couriers**

110.    Plaintiff repeats and realleges each and every allegation stated above.

24

111.    Defendant is Plaintiff's and putative collective members' "employer" for purposes of the Fair Labor Standards Act, 29 U.S.C. § 203(s), because it has annual gross sales or business of at least $500,000 and has employees engaged in interstate commerce.

112.    Plaintiff and the members of the proposed FLSA collective were employees of Defendant for purposes of the Fair Labor Standards Act during all times relevant to this Complaint.  Defendant has failed to pay Plaintiff and the members of the putative collective an hourly rate of at least the minimum wage of $7.25 per hour as required by the FLSA, 29 U.S.C. § 206, because Plaintiff and putative collective members have borne significant business expenses, such as fuel and vehicle maintenance, that lower their hourly wage below the statutory minimum in many weeks.

113.    Plaintiff and the members of the putative collective are also entitled to liquidated damages equal to the amount of unpaid minimum wages due to them under the FLSA, pursuant to the FLSA, 29 U.S.C. § 216(b).

114.    Plaintiff and members of the putative collective are also entitled to an award of reasonable attorneys' fees and costs incurred in prosecuting this action, pursuant to 29 U.S.C. § 216(b).

### SECOND CAUSE OF ACTION
**Violation of the Fair Labor Standards Act – Failure to Pay Overtime Wages**
**29 U.S.C. § 201, *et seq.***
**Brought by Plaintiff on Behalf of Herself and all Similarly Situated Couriers**

115.    Plaintiff repeats and realleges each and every allegation stated above.

25

116.     Plaintiff and members of the proposed collective routinely worked in excess of forty (40) hours per workweek for Defendant.

117.     Defendant failed to pay Plaintiff and the members of the putative collective at the rate of one-and-a-half times their regular rate of pay for all hours worked in excess of forty hours weekly as required by section 7(a) of the FLSA, 29 U.S.C. § 207(a).

118.     Plaintiff and members of the putative collective are entitled to back wages at the rate of one-and-a-half times their regular rate of pay for all overtime hours worked in excess of forty hours per week, pursuant to section 16(b) of the FLSA, 29 U.S.C. § 216(b).

119.     The failure of Defendant to compensate Plaintiff and members of the putative collective for overtime work as required by the FLSA was knowing, willful, intentional, and done in bad faith.

120.     Plaintiff and members of the putative collective are also entitled to liquidated damages equal to the amount of unpaid overtime compensation due to them under the FLSA, pursuant to section 16(b) of the FLSA, 29 U.S.C. 216(b).

121.     Plaintiff and members of the putative collective are also entitled to an award of reasonable attorneys' fees and costs incurred in prosecuting this action, pursuant to 29 U.S.C. § 216(b).

### THIRD CAUSE OF ACTION
**Violation of the North Carolina Wage and Hour Act
N.C. Gen. Stat. § 95-25.1, *et seq*.**

26

**Brought by Plaintiff on Behalf of Herself and all Similarly Situated Couriers**

122. Plaintiff repeats and realleges each and every allegation stated above.

123. The class period for this cause of action is at least two years from the date of the filing of the instant Complaint.

124. At all relevant times, Defendant has employed, and/or continues to employ, Plaintiff and members of the putative class within the meaning of the NCWHA, N.C. Gen. Stat. § 95-25.2(3) in that they were suffered or permitted to work.

125. Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and promised wages, on the employee's regular payday.

126. Defendant employed Plaintiff and members of the putative class within the State of North Carolina.

127. Additionally, North Carolina law requires every employer to notify employees of the promised wages and the day of payment as well as making available a written version of the employment practices and policies regarding promised wages. See N.C. Gen. Stat. § 95-25.13(1)-(2).

128. Pursuant to the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6, Defendant was required to pay Named Plaintiff and putative class members all wages, when due, for all promised earned and accrued regular, straight, and overtime wages of one and one-half times the promised wage rate, which is a part of all the employees'

27

accrued and earned wages, and which should have been paid when due on the employees'

regular payday; this requirement is not covered by the overtime provision under the

FLSA.

129.    As provided in the preceding paragraphs, Defendant failed to pay Plaintiff

and members of the putative class all legally due wages on their regular payday; this

requirement is not covered by the minimum wage or overtime provisions of the FLSA.

130.    Pursuant to N.C. Gen. Stat. § 95-25.8(a)(2), an employer may only

withhold or divert any portion of an employee's wages, "when the amount of the

proposed deduction is known and agreed upon in advance," after meeting several

requirements, including, but not limited to: (1) receiving written authorization from each

employee "on or before the payday(s) for the pay period(s) from which the deduction is

to be made"; (2) providing the reason for each deduction; and (3) providing advance

written notice of the actual amount to be deducted.

131.    Defendants violated N.C. Gen. Stat. § 95-25.8(a)(2) by not receiving

sufficient authorization from Plaintiff and members of the putative class, including, but

not limited to, failing to receive written authorization from each employee "on or before

the payday(s) for the pay period(s) from which the deduction is to be made."

132.    Additionally, under N.C. Gen. Stat. § 95-25.8, and the accompanying

regulation, 13 N.C. Admin. Code 12 § .0305(g), "If an employer withholds or diverts

wages for purposes not permitted by law, the employer shall be in violation of G.S. 95-

28

25.6 . . . even if the employee authorizes the withholding in writing pursuant to G.S. 95-25.8(a), because that authorization is invalid."

133. Defendant violated 13 N.C. Admin. Code 12 § .0305(g) by withholding Plaintiff's and members of the class's wages for purposes not permitted by law, including, but not limited to, a worker's compensation insurance policy that, upon information and belief, does not exist, because Plaintiff and members of the class were never classified as employees, and thus could not make a worker's compensation claim.

134. As provided herein, Plaintiff and members of the putative class are entitled to all unpaid earned, accrued, and/or promised wages, and/or unlawful deductions, under the NCWHA.

135. Plaintiff and members of the putative class are also entitled to liquidated damages equal to the amount of unpaid wages and/or unlawful deductions, as well as prejudgment interest, as provided under N.C. Gen. Stat. § 95-25.22(a) and (a1), as Defendant cannot show that its acts or omissions were done in good faith and that it had reasonable grounds for believing its acts or omissions were not a violation of the NCWHA.

136. As a result of Defendant's unlawful acts, Named Plaintiff and putative class members have been deprived of all compensation due under the law, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d).

29

**FOURTH CAUSE OF ACTION**
**Violation of the Age Discrimination in Employment Act**
**29 U.S.C. § 621 *et seq.***
**Age Discrimination, Hostile Work Environment, Wrongful Termination, and Retaliation**
**Brought by Plaintiff**

137.    Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

138.    Defendant is an "employer" as defined by ADEA, ADEA, 29 U.S.C. § 630(b), because it employs twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

139.    As alleged above, Plaintiff was repeatedly subjected to ridicule, abuse, humiliation, and beratement as a direct result of her age.

140.    Such discrimination and harassment was ongoing from approximately November 2018 until January 29, 2020, when Plaintiff was terminated.

141.    Such discrimination and harassment was based on Plaintiff's age, a protected status. Plaintiff's younger co-workers were not treated in the same demeaning way Plaintiff was treated.

142.    Such discrimination and harassment was sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.

143.    Such discrimination and harassment was unwelcome.

144.   While Plaintiff informed her supervisors and Defendant CEO of such discrimination and harassment, Defendant failed to take any corrective action upon hearing reports of harassment.

145.   Plaintiff engaged in a protected activity under the ADEA when she reported harassment, threats, and discrimination to Defendant's management.

146.   Before conducting any investigation, Defendant's CEO responded to Plaintiff's complaint regarding said discrimination and harassment by telling plaintiff that he did not believe her concerns were age-based.

147.   Defendant then dismissed Plaintiff's complaint as unfounded without sharing any investigative report or findings with Plaintiff.

148.   Plaintiff was discharged from employment less than a month after her complaint was dismissed by Defendant's management. This discharge constitutes wrongful termination in violation of 29 U.S.C. § 623(d).

149.   As a direct and proximate result of Defendant's violation of Plaintiff's rights under the ADEA, as alleged herein, Plaintiff has been injured and suffered damages, including lost income and benefits, loss of reputation, emotional distress and mental anguish, humiliation, inconvenience, and loss of enjoyment of life.  Accordingly, Plaintiff is entitled to compensatory damages, back pay, reinstatement or front pay, and attorneys' fees and costs, pursuant to 29 U.S.C. § 626(b).

150.    Additionally, since Defendant's violations of the ADEA, as alleged herein, was intentional, willful, knowing and malicious, or with reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to recover liquidated damages from Defendant, pursuant to 29 U.S.C. § 626(b).

**FIFTH CAUSE OF ACTION**
**Wrongful Discharge in Violation of North Carolina Public Policy**
**North Carolina Common Law**
**Brought by Plaintiff**

151.    It is the public policy of the State of North Carolina, as expressed in, *inter alia*, N.C. Gen. Stat. §§ 143-422.2, Article I, Section 1 of the North Carolina Constitution, and ubiquitously throughout the statutes and laws of this State, that employees be free from age-based harassment, discrimination and retaliatory treatment in their employment.

152.    The termination of Plaintiff's employment, resulting from her complaints and suffering related to the acts of age discrimination and age-based harassment, was wrongful as against the public policy of the State of North Carolina.

153.    Such termination proximately caused Plaintiff to suffer emotional distress and other losses, as described above.  Accordingly, Plaintiff is entitled to compensatory damages under North Carolina law, and interest pursuant to N.C. Gen. Stat. § 24-5(b).

32

154. Defendant's acts constituted willful, wanton, and malicious conduct, entitling Plaintiff to punitive damages pursuant to Chapter 1D of the North Carolina General Statutes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and all those similarly situated, collectively pray that this Honorable Court:

1. Issue an Order certifying this action as a collective action under the FLSA, and authorizing the sending of appropriate notice to current and former couriers who worked for Defendant and who are potential members of the collective action, giving them the opportunity to opt-in to this action;

2. Issue an Order pursuant to Rule 23 certifying this action as a class action under the NCWHA, appointing Plaintiff as class representative and the undersigned counsel as class counsel;

3. Issue a declaratory judgment that Defendant has willfully and in bad faith violated the minimum wage and overtime provisions of the FLSA, and the wage payment and deduction provisions of the NCWHA, and has deprived Plaintiff and the members of the putative collective and class of their rights to such compensation;

4. Award Plaintiff and all those similarly situated actual damages for all unpaid wages found due and illegal deductions withheld, and liquidated damages equal in

33

amount, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a1);

5.     Award Plaintiff and all those similarly situated pre- and post-judgment interest at the statutory rate, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a);

6.     Award Plaintiff and all those similarly situated attorney's fees, costs, and disbursements as provided by FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(d);

7.     Award Plaintiff all back pay, front pay, and past pecuniary losses due as a result of Defendant's unlawful acts;

8.     Award Plaintiff all compensatory damages due as a result of Defendant's unlawful acts;

9.     Award Plaintiff all consequential damages due as a result of Defendant's unlawful acts;

10.     Award Plaintiff punitive damages for Defendant's malicious, reckless, or grossly negligent conduct;

11.     Award Plaintiff all costs incurred in the prosecution of this action, including reasonable attorney's fees;

12.     Award Plaintiff pre-judgment interest; and

13.    Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this May 22, 2020.

*/s/ Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Charlotte C. Smith (NCSB No. 53616)
Robert W.T. Tucci (NCSB No. 55014)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Dr. Ste. 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com
rtucci@gildahernandezlaw.com

*Attorneys for Plaintiff*

35